**AFFIDAVIT**

**STATE OF WEST VIRGINIA**

**COUNTY OF RALEIGH, to-wit:**

I, Asa Gravley, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AFFIANT BACKGROUND

1. I make this affidavit in support of an application for a search warrant to search a property and associated structures located at 221 Plumley Avenue, Beckley, West Virginia (hereinafter the **TARGET LOCATION**) maintained and used by Liteef Hughes (HUGHES) for the purposes of storing and distributing controlled substances. As set forth herein, probable cause exists that HUGHES has committed and continues to commit violations of 21 U.S.C. Section 841(a)(1) – distribution and possession with intent to distribute cocaine base. Furthermore, probable cause exists that evidence, proceeds, and fruits and instrumentalities of those offenses are currently located within the **TARGET LOCATION** more particularly described in ATTACHMENT A.

2. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (hereinafter ATF), and have been since May 2021. As such, I am a "federal law enforcement officer" within the meaning of Fed. R. Crim. P. 41(a)(2)(C) and am authorized to apply for federal search warrants. I am currently assigned to the

Charleston, West Virginia, Field Office. I am a graduate of the Federal Law Enforcement Training Center's Criminal Investigator Training Program and the ATF National Academy at the Federal Law Enforcement Training Center in Brunswick, Georgia. Prior to my employment with ATF, I was employed as a United States Probation Officer in Western District of North Carolina in Charlotte, North Carolina, from September 2017, until May 2021. In that capacity, I was assigned to the supervision unit, and the Search Enforcement Team. Through my employment, as well as my training and experience, I have participated in numerous complex investigations involving the illegal possession and trafficking of both controlled substances and firearms. In connection with my official ATF duties, I investigate criminal violations of federal firearms and controlled substance trafficking laws, including, but not limited to violations of Title 21 U.S.C. §§ 841 & 846, as well as violations of Title 18 U.S.C. §§ 922 & 924. I have been involved in various types of electronic surveillance, and in the debriefing of defendants, witnesses, and informants, as well as others who have knowledge of firearms related offenses, the distribution and transportation of controlled substances, and of the laundering and concealing of proceeds from drug trafficking. I have conducted investigations regarding the unlawful possession, and distribution of controlled substances in violation of Title 21, U.S.C. §§

841(a)(1) & 846, as well as other controlled substance offenses.

3. I am familiar with the ways in which drug traffickers conduct their business, including, but not limited to: their methods of importing and distributing controlled substances, their use of telephones and other electronic devices, and their use of numerical codes and code words to conduct their transactions. I am familiar with and have participated in all the normal methods of investigation, including, but not limited to, physical/electronic surveillance, the general questioning of witnesses, and the use of an informant. Based upon my training and experience, I am familiar with (a) the manner and methods by which illegal drugs are imported, stored, and distributed; (b) the method of payment for such drugs; (c) methods of money laundering; and (d) the efforts of persons involved in such activity to avoid detection by law enforcement.

4. The facts set forth in this affidavit come from my personal observations, my training and experience, information obtained from other agents and law enforcement personnel, and witnesses. This affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5. This application is for a search warrant for the property located at the **TARGET LOCATION,** which contains a single-story

cinder block residence that is brown in color and has a covered front porch, with black in color porch posts, and a black in color storm door. Attached below is a picture of the referenced **TARGET LOCATION**:



6.  Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. § 841(a)(1), have been committed, are being committed, and will be committed by HUGHES and evidence of these offenses may be found at the **TARGET LOCATION**.

**PROBABLE CAUSE**

7. On October 17, 2021, the Beckley Police Department (BPD) and Emergency Medical Services (EMS) in Raleigh County, West Virginia (WV), responded to a call for service at 510 Ewart Avenue, Apartment 76, Beckley, WV. Upon arrival, EMS determined a resident of the apartment, Tevin Jackson, was deceased. Through further investigation, BPD learned that on October 17, 2021, Jackson had allegedly been provided cocaine by HUGHES at 225 Plumley Avenue, Beckley, WV, with his (Jackson's) overdose having occurred shortly thereafter.

8. In January 2022, the Office of the Chief Medical Examiner for the State of West Virginia completed an autopsy report for Jackson. The report advised Jackson's death was attributed to a mixed drug toxicity consisting of alcohol, THC, cocaine, and fentanyl.

9. On November 2, 2021, ATF SA David Bullard spoke with SA Joshua Futter of ATF Baltimore, Maryland (MD). SA Futter advised that a source of information (SOI) stated that HUGHES was responsible for some overdoses that had occurred in the Beckley, WV, area. The SOI further stated that HUGHES was hiding out in Baltimore, MD, with his brother Randy Hughes, until things cool

down. The SOI also advised that HUGHES was attempting to obtain firearms for transport to Baltimore, MD.

10. Based on your affiant's training and experience, I know that drug distributors often mix fentanyl with other controlled substances such as heroin and cocaine to increase the potency of the substance, thereby increasing the interests of drug users, which in turn can increase drug distribution profits for a dealer.

11. In November 2021, HUGHES and his brother, Randy Hughes, of Baltimore, Maryland (MD), utilized an individual to straw purchase a firearm from Flat Top Arms in Beckley, WV. As part of the straw purchase, HUGHES and an FBI informant obtained the firearm from the individual for transport to Baltimore, MD, which FBI Baltimore ultimately intercepted.

12. On March 24, 2022, ATF Task Force Officer (TFO) Jason Redden spoke with a reliable confidential informant (CI #1) with a history of providing information that led to subsequent state and federal drug convictions. CI #1 advised they had purchased "food" from a third-party at the **TARGET LOCATION** in March 2022. TFO Redden asked CI #1 what "food" referred to and CI #1 stated heroin/fentanyl.

13. On April 19, 2022, your affiant obtained a received and reviewed a State of West Virginia Division of Corrections Probation and Parole Supervision Report (hereinafter probation supervision report) signed and submitted by HUGHES on April 7, 2022, in

relation to him serving an active term of probation, pursuant to an April 23, 2021, felony conviction in Raleigh County, WV, for Delivery of Cocaine. On the report HUGHES listed his address as the **TARGET LOCATION** and his phone number as "443-396-4305."

14. On April 27, 2022, ATF Confidential Informant 30963 (CI #2) conducted a recorded phone call with HUGHES via Facebook Messenger. It should be noted CI #2 identified the profile as belonging to HUGHES. Additionally, your affiant observed a Facebook Messenger profile picture which your affiant identified as HUGHES. During the call, CI #2 spoke with HUGHES. CI #2 requested to purchase a half-ounce of cocaine from HUGHES on April 28, 2022. HUGHES instructed CI #2 to contact him on that day.

15. On April 28, 2022, CI #2 conducted a recorded phone call to telephone number (443) 396-9305, which is the same phone number listed on HUGHES April 2022 probation supervision report. During the phone call, CI #2 asked HUGHES if they could visit him during the afternoon of April 28, 2022, with their money. HUGHES told CI #2 that would be ok. Following the phone call, CI #2 explained to your affiant that on multiple prior occasions they had purchased cocaine from HUGHES at the **TARGET LOCATION**. Additionally, CI #2 described the **TARGET LOCATION's** appearance which matched what your affiant knows to be the **TARGET LOCATION**.

16. On April 28, 2022, CI #2 conducted a controlled purchase of suspected cocaine base that was pre-packaged from HUGHES inside

the **TARGET LOCATION**. Additionally, your affiant reviewed the controlled purchase video and observed what appeared to be a set of digital scales laying on the kitchen counter, with what appeared to be drug packaging materials on or near the scales in the **TARGET LOCATION**. HUGHES was also observed in the controlled purchase video holding a cell phone and speaking with CI #2.

17. Based on your affiant's training and experience, persons involved in the distribution of illegal narcotics commonly store the illegal narcotics within locations that they frequent, or own, to protect and conceal the illegal narcotics. Moreover, individuals who engage in the sale of controlled substances often keep their illegal drugs and drug proceeds in hidden locations to protect their interest in such items from law enforcement or other individuals who may wish to steal their bounty.

18. Following the controlled purchase on April 28, 2022, CI #2 turned over the suspected cocaine base to your affiant. A field test for the recovered white rock like substance yielded a presumptive positive for cocaine base. Thereafter, CI #2 conducted another recorded phone call to phone number (443) 396-9305 and spoke with HUGHES. CI #2 advised HUGHES they would come by next week to purchase additional cocaine base. HUGHES indicated that would be fine.

19. Based on your affiant's training and experience, individuals who distribute illegal narcotics keep records of their

sales and customers as well as scales and money counting machines to assist them in their illegal enterprise.

20. Based on your affiant's training and experience, I know that it is a common practice for drug traffickers to use and keep cellular telephones in order to facilitate their drug trafficking business. Cellular telephones allow traffickers to remain in close and nearly instantaneous communication with their customers and suppliers. In my experience, it is common that the electronic memories of cellular telephones used by drug distributors and users contain evidence of drug trafficking. This evidence includes the following: call logs, text messages, stored emails, contact lists, photographs and video images of drugs, drug proceeds, and drug trafficking paraphernalia and activity. Additionally, cellular telephones have mapping and other applications installed within their operating systems that capture location data identifying travel to and from places where drug traffickers store, sell, use or distribute controlled substances, keep property used to facilitate drug trafficking and maintain the proceeds of drug trafficking.

21. Based upon your affiant's training and experience, your affiant knows that persons involved in the distribution of controlled substances who possess, trade, or brandish firearms or ammunition, commonly maintain firearms, ammunition, sales receipts, and other documents related to the ownership of said

firearms and ammunition in their residences or places that they frequent. Additionally, your affiant knows that persons involved in the distribution of controlled substances, who possess firearms or ammunition (and indeed anyone who possesses firearms or ammunition) commonly store firearms and ammunition for those firearms in their residences, businesses, or other places that they frequent.

22. Based on your affiants training and experience, persons involved in the distribution of controlled substances often work in connection with other individuals who also sell narcotics. Individuals engaged in the distribution of narcotics will typically come from or return to a location where they keep their supply of narcotics/ proceeds from the sale of the narcotics, before or after meeting with an informant.

23. Additionally, in your affiant's training and experience, individuals who engage in the sale of controlled substances often have large amounts of vehicle and/or foot traffic at the property associated with their drug distribution. Specifically, the foot traffic associated with these properties typically stays at the location for short periods of time and leave soon after having obtained their product.

24. Lastly, in your affiant's training and experience, individuals who distribute illegal narcotics often utilize cameras and other individuals as lookouts to monitor the areas, they

conduct their drug distribution activity to protect and alert themselves of law enforcement presence.

## CONCLUSION

25. Based upon the foregoing information, the affiant submits that there is probable cause to believe that within the **TARGET LOCATION**, there is evidence of criminal activity including controlled substances, firearms, United States Currency, records and documents related to the sale of controlled substances, scales, cell phones, indicia of ownership and other items of evidence related to violations of Title 21 U.S.C. § 841.

Respectfully submitted,

Asa Gravley
Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives

Subscribed and sworn to before me on this <u>2nd</u> day of May 2022



Omar J. Aboulhosn
United States Magistrate Judge